1ST CIRCUIT COURT
STATE OF HAWAII
FILED

2007 MAY 15 AM 8: 08

R. HIGA
CLERK

DAVIS LEVIN LIVINGSTON GRANDE

THOMAS R. GRANDE     3954
851 Fort Street, Suite 400
Honolulu, Hawai'i 96813
Telephone: (808) 524-7500
Facsimile: (808) 545-7802
Email: tgrande@davislevin.com


EMILY A. GARDNER     6891
Attorney at Law
Dillingham Transportation Building
735 Bishop Street, Suite 402
Honolulu, Hawai'i 96813
Telephone: (808)-540-0200
Facsimile: (808)-540-0201
Email: eagardner@hawaii.rr.com

Attorneys for Plaintiff

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| YVONNE ORTIZ, individually and on behalf of all others similarly situated persons, <br><br>        Plaintiff, <br><br>    v. <br><br> MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unincorporated Canadian business; Doe Entities and Individuals 1- 100, <br><br>        Defendants. | Civil No. 07-1-0849-05   E E R <br> (Class Action) <br><br><br> PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; MEMORANDUM IN SUPPORT OF MOTION; DECLARATION OF THOMAS R. GRANDE; DECLARATION OF YVONNE ORTIZ; and NOTICE OF HEARING MOTION AND CERTIFICATION OF SERVICE <br><br> HEARING: <br><br> DATE: July 18, 2007 <br><br> TIME: 2:00 pm. <br><br> JUDGE: Hifo |

RECEIVED
LDB (FIO) MAY 1 1 2007

1

EXHIBIT A

## PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

Plaintiff above named, through her counsel, moves for certification of the proposed class in this case.

This Motion is made as soon as practicable after filing the complaint pursuant to Hawaii Rules of Civil Procedure ("HRCP"), Rules 23(a), 23(b)(1) and (b)(3) and is based upon the accompanying memorandum, exhibits, declarations and all the pleadings and filings in this case.

DATED: Honolulu, Hawaiʻi, _____ MAY 1 1 2007 _____.

THOMAS R. GRANDE
EMILY A. GARDNER

Attorneys for Plaintiffs

2

EXHIBIT A

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| YVONNE ORTIZ, individually and on behalf of all others similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unincorporated Canadian business; Doe Entities and Individuals 1- 100,<br><br>Defendants. | Civil No. _____<br>(Class Action)<br><br><br>MEMORANDUM IN SUPPORT OF MOTION |

<u>MEMORANDUM IN SUPPORT OF MOTION</u>

## I.    INTRODUCTION

In this case, Menu Foods produced, manufactured, marketed and/or sold contaminated and adulterated dog and cat food that contained aminopterin, a type of rat poison, and melamine, an industrial chemical sometimes used in fertilizer in countries outside the United States. The food contaminants have been shown to cause serious injury, illness and/or death to dogs and cats. A current listing of the contaminated and adulterated dog and cat food products ("Recalled Products") sold by Menu Foods is contained in Exhibit 1 of the Complaint. (http://www.menufoods.com/recall/product_cat.html and http://www.menufoods.com/recall/product_dog.html).

Menu Foods has admitted that its products were contaminated and adulterated and has initiated a voluntary recall of the contaminated and adulterated dog and cat food products.



Complaint, Exhibit 2: Statement of Paul Henderson, President and Chief Executive Officer of Menu Foods
(http://www.menufoods.com/recall/PR%20Introductory%20Remarks%2004242007.htm).

This class action seeks the following relief for Hawai'i consumers who purchased Menu Foods' contaminated and adulterated food for their dogs and cats:

a)    Declaratory relief that Menu Foods sold contaminated and adulterated pet food in violation of the Hawai'i Food, Drug & Cosmetic Act, HRS Chapter 328, which prohibits the manufacture, sale, delivery, holding, or offering for sale of any food that is adulterated  because it contains  a poisonous or deleterious substance which may render it injurious to health.  Under HRS § 328-1, "Food" is expressly defined as "articles used for food or drink by humans, dogs or cats.";

b)   Injunctive relief to:  (1) prevent Menu Foods from selling contaminated and adulterated food products in the state of Hawai'i; and (2) ensure that no adulterated pet food is still being sold in the Sate of Hawai'i, and/or (3) to pay for the costs of veterinary screening examinations for any pet that consumed the contaminated food, and

c)    Monetary damages for the cost of purchasing the adulterated and contaminated food by Hawai'i consumers, including consequential damages for out of pocket veterinary examinations and future veterinary examinations.  See generally Complaint, paragraphs 1-3.

## II.    PROPOSED CLASS

The proposed Class is defined as follows:

> All Hawai'i consumers who purchased pet food on the Menu Foods recall
> list between November 8, 2006 and March 6, 2007.

Excluded from the Class are the following:  (a) Defendants; (b) Defendants' subsidiaries , parents, and affiliates, including all directors, officers, and employees thereof; (c) members of

4



the immediate family of any of the foregoing, if natural persons; (d) the legal representatives,
heirs, successors, and assigns of any of the foregoing; (e) any person in which any of the
foregoing has a controlling interest and (f) any claim for personal injury for any pet.

## III.    STATEMENT OF FACTS

In March 2007 Menu Foods recalled 53 brands of cuts and gravy wet-style dog food and
42 brands of cuts and gravy wet-style cat food which had caused dogs and cats to become ill.
One common symptom in the sick dogs and cats was kidney failure, also known as acute renal
failure.  The dog and cat food was ultimately found to be contaminated with aminopterin (rat
poison) and melamine, an industrial chemical banned for use in the United States.

### Menu Foods' Claims About The Quality of Its Pet Food

Menu Foods is the largest maker of wet dog and cat food in North America, with its
products sold under 95 brand names through supermarkets, big box, and pet product retailers and
wholesalers.  Menu Foods manufactures pet food for 17 of the top 20 North American retailers
and is also a contract manufacturer of branded pet food products, manufacturing for five of the
top six branded companies in North America.  It is the only manufacturer in North America
offering wet food in the pouch format.  Menu Foods holds itself out to the public as a
manufacturer of safe, nutritious, and high-quality dog and cat food.  Complaint, Exhibit 2:
Statement of Paul Henderson, President and Chief Executive Officer of Menu Foods
(http://www.menufoods.com/recall/070330E%20Opening%20Statement%20-
%20March%2030%202007.htm).

In conjunction with the sale of its pet food products, Menu Foods marketed, advertised,
and warranted that its pet food was fit for the ordinary purpose for which it was sold –
consumption by dogs and cats– and that its products were free from defects.  Menu Foods

EXHIBIT A

produces its pet food products intending that consumers will purchase the pet food products, regardless of brand or label name, place of purchase, or the location where pets actually consume them. Menu Foods pet food products were placed in the stream of commerce, distributed, and offered for sale and sold to Plaintiff and Class Members in Hawai'i to feed to their dogs and cats.

Menu Foods makes numerous express and implied warranties about the quality of its food and its manufacturing facilities. For example, Menu Foods claims that it "manufacture[s] the private-label, wet pet-food industry's most comprehensive product program with the highest standards of quality" and it operates "state-of-the-art" manufacturing facilities in the United States and Canada. Menu Foods intended for pet owners to believe its statements that its pet food is of first-rate quality.

### Menu Foods Use of Adulterated Wheat Flour

In late 2006, Menu Foods began to use a new supplier of wheat gluten from China named Xuzhou Anying Biologic Technology Development Company Ltd. ("Xuzhou"). In wet pet food, wheat gluten is added for two purposes: (1) to provide a meaty texture and (2) as a binding agent. A meaty texture is an important characteristic of wet pet foods. Instead of wheat gluten, Menu Foods purchased contaminate wheat flour.

Despite the fact that Menu Foods was purchasing a major ingredient used in many of the foods it manufacturers from a new supplier, Menu Foods did not test or otherwise determine whether or not the wheat flour it was purchasing was safe for its intended purpose—consumption by dogs and cats. As North America's leading manufacturer of wet dog and cat foods—for more than 95 different brands—Menu Foods merely went on the assumption that the new wheat flour it purchased from a foreign provider would perform safely and as intended.

EXHIBIT A

## Menu Foods Discovery of Adulterated Pet Food & Voluntary Recall

On information and belief, Menu Foods may have first learned that its pet food was causing health problems to the dogs and cats that ate it in December of 2006. However, Menu Foods had actual knowledge of the contamination at least by February 20, 2007.

On or about February 27, 2007, Menu Foods began testing its products on between 40 to 50 dogs and cats. Between 7 and 10 of those dogs and cats died during the test period.

On March 6, 2007, Menu Foods switched to a different supplier of wheat gluten.

On March 16, 2007— almost one month after confirming that its products were causing illness and death in dogs and cats, and ten days after it secured a new supplier for wheat gluten so that it could continue to manufacture its products—Menu Foods initiated a recall of 51 brands of "cuts and gravy" style dog food and 40 brands of "cuts and gravy" style cat food. All of these products were produced at Menu Foods U.S. facilities between Dec. 3, 2006 and March 6, 2007. The original recall involved 91 different products and 60 million cans and pouches of cat and dog food.

The Menu Foods product recall list has been amended several times since March 16, 2007 to include additional brands, and expanded to include products manufactured back to November 8, 2006. The most recent expansion occurred on or about May 2, 2007 and was implemented to address cross-contamination in products manufactured during the same time the products containing the toxic wheat flour were manufactured. Menu Foods' current recall list includes 220 different products.

On March 30, 2007 Menu Foods asserted that the pet food manufactured in its Emporia, Kansas and Pennsauken, New Jersey facilities after March 6 is "safe and healthy" because it contains no melamine, no wheat gluten from Xuzhou, and that "those products not associated

# EXHIBIT A

with the suspect wheat gluten performed very well and in a manner consistent with historic norms."

Menu Foods has admitted that certain of its pet food products produced between November 8, 2006 and March 6, 2006 contained contaminants and that its products were contaminated and adulterated, defective and potentially causing injury and death to dogs and cats. See Complaint, Exhibit 1.

### FDA and State Regulatory Confirmation of Contamination and Adulteration

The United States Food and Drug Administration ("FDA") has confirmed the existence of melamine in the recalled Menu Foods products and Cornell University has confirmed the existence of melamine in the urine and feces of deceased cats that were part of a taste testing study for Menu Foods. Complaint, Exhibit 3 (http://www.fda.gov/cvm/MenuFoodRecallFAQ.htm).

The FDA has concluded that the "association between melamine in the kidneys and urine of cats that died and melamine in the food they consumed is undeniable. Additionally, melamine is an ingredient that should not be in pet food at any level." Complaint, Exhibit 3, (http://www.fda.gov/cvm/MenuFoodRecallFAQ.htm).

The FDA reported that as many as one in six dogs and cats died in tests conducted by Menu Foods on its pet food products in February 2007 after Menu Foods received reports that its pet food was poisoning and killing pets. The FDA also has reported receiving thousands of consumer complaints about Menu Foods pet products from veterinarians and people having dogs and/or cats that consumed the tainted food. See Complaint, Exhibit 3, (http://www.fda.gov/cvm/petfoods.htm).

8

# EXHIBIT A

On March 23, 2007 New York State health officials reported that laboratory tests of the recalled Menu Foods products revealed the presence of aminopterin (rat poison) at levels of at least 40 parts per million. The pet food samples were tested by the New York State Animal Health Diagnostic Center at Cornell University and New York State Food Laboratory, which identified aminopterin as a contaminant. Complaint, Exhibit 4. (http://www.agmkt.state.ny.us/AD/release.asp?ReleaseID=1598).

The ACVIM has "recommended that pets (dogs and cats) that ingested pet food that was on the recall list, whether showing signs of illness (lethargy, vomiting, diarrhea, anorexia, etc.) or not (asymptomatic) should be seen by their veterinarian for baseline blood chemistries and urinalysis in order to ascertain the status of their renal (kidney) function. (The ACVIM is the Official Organization of the Veterinary Specialties of Small Animal Internal Medicine, Large Animal Internal Medicine, Cardiology, Neurology, and Oncology) http://www.acvim.org/)." (emphasis added).

### Hawai‘i Food, Drug and Cosmetic Act – HRS Chapter 328

Under the Hawai‘i Food, Drug and Cosmetic Act "food" is defined as "articles used for food or drink by humans, dogs or cats." HRS § 328-1.

HRS Chapter 328 applies to Defendants because they are engaged in the "selling of food... includ[ing] the manufacture, production, processing, packing, exposure, offer, possession, and holding of any such article for sale..." HRS § 328-5.

Under "HRS §328-6, Prohibited acts, the following acts and the causing thereof within the State by any person are prohibited: (1) The manufacture, sale, delivery, holding, or offering for sale of any food, drug, device, or cosmetic that is adulterated or misbranded..."

EXHIBIT A

Under Hawaiʻi Administrative Rules §11-29-3(b) "[d]og and cat food…shall mean a food that is wholesome and nutritious for dogs and cats…."

Under HRS § 328-9(1), " A food shall be deemed to be adulterated… (A) If it bears or contains any poisonous or deleterious substance which may render it injurious to health…[or]…(C) If it ….is otherwise unfit for food…"

Defendant sold pet food products that -- by Defendants' own admissions and the findings of federal and state agencies-- were adulterated within the meaning of HRS Chapter 328, that contained poisonous or deleterious substances which may render them injurious to health and/or that were otherwise unfit for food.

Defendants' recall of its pet food products confirm that its products were unfit for food. See generally Complaint, paragraphs 4 – 29.

## VI.    CERTIFICATION IS APPROPRIATE IN THIS CASE.

The class action vehicle was created to promote the fair and expeditious resolution of all of the claims where a large number of people have been injured by the same occurrence:

> The class action was an invention of equity . . . mothered by the practical necessity of providing a procedural device so that mere numbers would not disable large groups of individuals, united in interest, from enforcing their equitable rights nor grant them immunity from their equitable wrongs. By Rule 23 of the Hawaii Rules of Civil Procedure, we have extended the permissible use of this procedural device to all civil litigation in the circuit courts of Hawaii.

*Life of the Land v. Land Use Commission of the State of Hawaii,* 63 Haw. 166, 179, 623 P.2d 431, 442 (1981) (internal citations omitted). The class action was created as "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *General Telephone Company of Southwest v. Falcon,* 457 U.S. 147, 155, 102 S.Ct 2364, 2369, 72 L.Ed.2d 740 (1982). The class action device is designed to "save the resources of both the

## EXHIBIT A

courts and the parties by permitting an issue potentially affecting every class member to be litigated in an economical fashion." *General Telephone Company of Southwest v. Falcon*, 457 U.S. 147, 155, 102 S.Ct 2364, 2369, 72 L.Ed.2d 740 (1982).

In determining whether to certify a class the Court should construe Rule 23 liberally, and resolve all doubts in favor of class certification. *Blackie v. Barrack*, 524 F.2d 891, 903 (9th Cir. 1975). This is because class certification is always conditional and subject to modification. HRCP Rule 23(c)(1). Thus, any error in favor of certification can be rectified by a subsequent motion for full or partial decertification. By contrast, a decision to deny certification is essentially final, as class members have to file individual cases because the statute of limitations will no longer be tolled for them. *See Levi v. University of Hawaii*, 67 Haw. 90, 93, 679 P.2d 129, 132 (Hawaii 1984) ("One of the purposes of a class action suit is to prevent multiplicity of actions, thereby preserving the economies of time, effort and expense.")

Class certification is not an inquiry into the merits; rather, the Court must accept the allegations of the complaint as true for purposes of deciding whether a class should be certified. *Blackie v. Barrack*, 524 F.2d 891, 900-01 and n. 17 (9th Cir. 1975) ("The court is bound to take the substantive allegations of the complaint as true"); *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-79 (1974); Manual for Complex Litigation (Third) § 30.12 (determination as to whether Rule 23 is satisfied generally rests on pleadings and declarations); . Moreover, in deciding class certification the Court is not constrained by the rules of evidence or admissibility that would apply at a trial. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 178 (1974).

As more fully explained below, the proposed class in this case should be certified because all of the prerequisites for class certification are met under Rule 23(a), Rule 23(b)(1),(b)(2) and (b)(3). The alternative to certification – the prosecution of thousands of

EXHIBIT A

individual claims – will result in extreme logistical difficulties for the Court and Defendants, a waste of judicial resources, and the elimination of an orderly and reasonable process to resolve the common factual and legal issues which underlie this case.

A.    **RULE 23(a) IS MET.**

Rule 23 provides:

(a)  Prerequisites to a Class Action.  One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there is questions of law or fact common to the class, (3) the claims or defenses of the representative parties is typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Those requirements are met in the present case.

1.    NUMEROSITY

"Rule 23(a)(1) requires that the class be so numerous that the joinder of all members would be impracticable. While many state courts have held numerosity to be a number exceeding a hundred, the requirement has been satisfied by as few as thirteen potential individuals who may be included in a class." *Life of the Land v. Burns*, 59 Haw. 244, 253, 580 P.2d 405, 411 (1978) (internal citations omitted).

The probable class size in this case is several thousand.  There were approximately 60 million pouches of pet food that were recalled, with an estimated 200,000 pouches recalled from Hawai'i.  Declaration of Thomas R. Grande.  Numerosity is clearly established.

2.    COMMONALITY

HRCP 23(a)(2) requires also that the Court find that there be "questions of law or fact common to the class."          *Life of the Land v. Land Use Commission*, 63 Haw. 166, 182, 623 P.2d 431, 444 (1981)(emphasis added)("The inquiry here focuses on 'What Are The Claims Or Defenses of The Class,' and the pertinent criterion is the presence of common claims or defenses

EXHIBIT A

extending throughout the class.") "The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is there need be only a single issue common to all members of the class. Therefore, this requirement is easily met in most cases." 1 *Herbert Newberg & Alba Conte, Newberg on Class Actions* § 3:10 (4th Ed. 2005)(emphasis added). Plaintiffs have satisfied HRCP Rule 23(a) (2), which requires only that there be *one* questions of law or fact common to the Class.

"This commonality requirement is a 'low hurdle' easily surmounted." *Duhaime v. John Hancock Mutual Life Insurance Company,* 177 F.R.D. 54, 62 (D. Mass. 1997) *quoting Scholes v. Stone, McGuire & Benjamin,* 143 F.R.D. 181, 185 (N.D.Ill.1992).

The following questions of law or fact are common to the class:

1.    All Class members are consumers who purchased Menu Foods products during the Class period.

2.    Menu Foods purchase of pet food product ingredients containing rat poison and melamine.

3.    Menu Foods' conduct in failing to adequately test and/or inspect its products for rat poison and melamine.

4.    Menu Foods sale and marketing of food products that were adulterated and/or unsafe for their intended purpose.

3.    **TYPICALITY.**

The HRCP 23(a)(3) requirement that the named plaintiff's claims be typical is satisfied where there is no conflict of interest between the claims of the named plaintiff and the claims of the class. *See Life of the Land,* 63 Haw. at 183, 623 P.2d at 445 ("Reading the third and fourth preconditions together, we too equate typicality with the absence of conflict of interest.").

EXHIBIT A

Typicality does not mean the representative's claims must be coextensive with, or factually identical to, those of the Class. *Blackie v. Barrack*, 524 F.2d 891, 910 (9th Cir. 1975); *Guenther v. Pacific Telecom, Inc.*, 123 F.R.D. 333, 336 (D. Or. 1988). Nor does typicality require that the entire Class rely on the same misrepresentations or omissions. *Blackie*, 524 F.2d at 902.

### a.    All Claims of Class Members Are the Same

Representative Plaintiffs satisfy Rule 23(a)(3)'s requirement in that the claims of the class representatives are typical of the claims of the Class. Their claims arise out of the same course of conduct as the other Class members' claims and are based upon the same standards for breach of trust and the same actions or inactions by DHHL.

### b.    Ms. Ortiz' Claims Are Typical of the Class

Ms. Ortiz' claims are typical of the class. Ms. Ortiz purchased pet food manufactured by Menu Foods during the Class period and seeks the same relief as all class members. Declaration of Yvonne Ortiz.

### 4.    ADEQUACY.

Rule 23(a)(4) requires that the "representative parties will fairly and adequately protect the interests of the class." "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Products v. Windsor*, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed. 2d 689 (1997).

Satisfaction of this condition requires the satisfaction of two sub-conditions: (1) that the suit not be collusive and plaintiffs' interests not be antagonistic or in conflict with the class; and (2) that the representative parties' attorney be qualified, experienced, and generally able to conduct litigation. 1 A. Conte, *Newberg on Class Actions* § 3.22 (4th Ed. 2005). Both prerequisites of adequacy of representation are met here.

14

# EXHIBIT A

Representative Plaintiff's interests are co-extensive and not in conflict with the interests of the class members. Class counsel are experienced and qualified to handle this litigation. Declaration of Thomas R. Grande.

## B.   RULE 23(B)(1) CERTIFICATION IS APPROPRIATE.

Under HRCP 23(b)(1), an action may be maintained as a class action if the requirements of Rule 23(a) are met and if "the prosecution of separate actions by or against individual members of the class would create a risk of inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class"

In the Advisory Committee's Notes to clause (A) of subdivision 23(b)(1), Fed. R. Civ. Pro., the Committee states that a party "may be so positioned that conflicting or varying adjudications in lawsuits with individual members of the class might establish incompatible standards to govern his conduct. The class action device can be used effectively to obviate the actual or vital dilemma which would thus confront" this party. Advisory Committee's Notes to Rule 23, 39 F.R.D. 98, 100 (1966). The note concludes that an action a class action in such a situation would "provide a ready and fair means of achieving unitary adjudication." *Id.*, *cited in, In re Itel Sec. Litigation*, 89 F.R.D. 104, 124 (D. Cal. 1981).

The 1966 Advisory Committee's Notes to Clause (B) of subdivision 23 (b)(1) state that the clause "takes in situations where the judgment in a non-class action by or against an individual member of the class, while not technically concluding the other members, might do so as a practical matter. The vice of an individual action would lie in the fact that the other members of the class, thus practically concluded, would have no representation in the lawsuit." Advisory Committee's Notes to Rule 23, 39 F.R.D. at 101-102. Thus, a finding in one individual action in

15

EXHIBIT A

the present case could substantially affect the rights of other beneficiaries who were not parties and not able to advance their interests.

In this case, the requirements of Rule 23(b)(1) are clearly met. If individual actions proceed against the Defendants, there is a clear risk of inconsistent rulings or adjudications that would establish incompatible standards of conduct for DHHL; The possibility of one subclass plaintiff's case affecting the outcome of others without their participation is a very real likelihood, given the consistency of the facts and law.

## C.    RULE 23(B)(2) CERTIFICATION IS APPROPRIATE.

Certification under HRCP 23(b)(2) is appropriate where the party opposing the class (Defendants herein) have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

If the party opposing the class either has acted in a consistent manner toward members of the class such that the defendants' actions are part of a pattern of activity or that there is a regulatory scheme common to all class members, (b)(2) certification is appropriate. Wright, Miller & Kane, *Federal Practice & Procedure*, section 1775 at 449 (1994).

Moreover, because the Court is being asked to resolve interpretation of the Hawaii Food, Drug and Cosmetic Statute, HRS § 631-1, the Hawaii declaratory judgment statute, provides:

> Controversies involving the interpretation of deeds, wills, other instruments of writing, statutes, municipal ordinances, and other governmental regulations, may be so determined [by declaratory relief], and this enumeration does not exclude other instances of actual antagonistic assertion and denial of right.

All of the elements for (b)(2) certification are met.

16

# EXHIBIT A

### D.     RULE 23(B)(3) CERTIFICATION IS APPROPRIATE.

Certification under Rule 23(b)(3) is appropriate where "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action."

#### 1.     Common Questions Predominate

"The predominance test is not a numerical test and does not require the court to add up the common issues and the individual issues and determine which is greater." *Deutschman v. Beneficial Corp.*, 132 F.R.D. 359, 375 (D. Del. 1990) (quoting 1 *Newberg on Class Actions* § 4.25 at 318 (2d ed. 1985)). "Rather, the court must determine whether the members of the class seek a remedy to a common legal grievance and whether the common questions of law and fact central to the litigation are common to all class members." 132 F.R.D. at 375.

"[P]redominance will be found where generalized evidence may prove or disprove elements of a claim." *In re Hartford Sales Practices Litigation*, 192 F.R.D. 592, 604 (D. Minn. 1990). "When determining whether common questions predominate, courts 'focus on the liability issue ... and if the liability issue is common to the class, common questions are held to predominate over individual questions.'" *Lewy 1990 Trust v. Investment Advisors, Inc.*, 650

EXHIBIT A

N.W.2d 445, 455-56 (Minn. App. 2002) (quoting *Genden v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 114 F.R.D. 48, 52 (S.D.N.Y. 1987)).

In this case, the issues of liability and damages predominate. All class members must prove liability and damages under the same legal standards based upon the same facts. Thus the following factual and legal questions predominate:

1.    The legal obligations of Defendants;

2.    The knowledge and conduct of the Defendants; and

3.    Damages to Class Members.

**2.    The Class Action is the Superior Method of Adjudicating this Controversy.**

A class action is the superior method of resolving the liability claims of each subclass. No class members have expressed an interest in pursuing individual claims through the commencement and prosecution of individual actions. Judicial economy will be served by concentrating the claims in one forum and there are no significant obstacles in the management of the liability claims.

**V.    CONCLUSION**

Because all of the prerequisites for class certification are met in this case, Plaintiffs respectfully requests that this Court grant the instant Motion and certify the proposed class as requested.

DATED: Honolulu, Hawai‘i, ___MAY 1 1 2007___.

THOMAS GRANDE
EMILY GARDNER
Attorneys for Plaintiffs

18

**EXHIBIT A**

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| YVONNE ORTIZ, individually and on behalf of all others similarly situated persons,<br><br>                    Plaintiff,<br><br>    v.<br><br>MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unicorporated Canadian business; Doe Entities and Individuals 1- 100,<br><br>                Defendants. | Civil No. _____<br>(Class Action)<br><br><br>Declaration of Yvonne Ortiz |

**<u>DECLARATION OF YVONNE ORTIZ</u>**

I, YVONNE ORTIZ, declare as follows:

1.     I have agreed to be a class representative in this lawsuit and I make all statements contained in this declaration on my own personal knowledge.



EXHIBIT A

2.    I have been told by my attorneys, Thomas R. Grande and Emily A. Gardner, a Complaint is being submitted to support a request that the Court certify this case as a class action.

3.    I have reviewed the Complaint in this case.  I understand that I am agreeing to represent a class of consumers who purchased Menu Foods pet food from November 8, 2006 through March 16, 2007.

4.    I live at 1465 Aala Street, #1201, in Honolulu.

5.    I own three cats and a dog.

6.    Until the Menu Foods recall was announced, I regularly purchased Priority One Dogfood and Priority One Catfood for my pets at Safeway Supermarket in downtown Honolulu.

7.    Between November 8, 2006 and March 6, 2007, I purchased  Priority One Dogfood and Priority One Catfood for my pets at Safeway Supermarket in downtown Honolulu.

8.    The Priority One Dogfood and Priority One Catfood purchased by me are on the Menu Foods recall list of contaminated food products.

9.    I do not believe that there is any conflict of interest or of loyalty between my obligations as a class representative in this case.



EXHIBIT A

10.    I understand that as a class representative, I am required to act in the best interest of all class members.  I agree to act in the best interests of the class in this case.

11.    I have a serious commitment to bring about the best litigation results possible for all class members, as evidenced by my serving as class representative and retaining experienced and competent counsel.  I am committed to the lawsuit and the claims asserted in this case and I believe that this case should be pursued on behalf of all pet owners who bought contaminated pet food from Menu Foods.

12.    I have the time and resources to devote to this case.

13.    I have a basic knowledge of the facts, parties, and basic issues in this case.  I will remain in contact with class counsel and keep informed of all procedural matters required of me.

I declare under penalty of perjury that the foregoing is true and correct.

DATED:    Honolulu, Hawaii, May_____, 2007.


_____
YVONNE ORTIZ


# EXHIBIT A

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| YVONNE ORTIZ, individually and on behalf of all others similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unincorporated Canadian business; Doe Entities and Individuals 1- 100,<br><br>Defendants. | Civil No. _____<br>(Class Action)<br><br>DECLARATION OF THOMAS R. GRANDE |

## **DECLARATION OF THOMAS R. GRANDE**

I, THOMAS R. GRANDE, declare as follows:

1.      I am an attorney licensed to practice law in the State of Hawaii, and am one of the attorneys for the Class in this case. I make this Declaration based upon my own personal knowledge of the matters herein set forth.

2.      I am a partner in the law firm of Davis Levin Livingston Grande, which was founded in 1980. The firm's primary expertise has been in the area of state and federal litigation. The firm and/or or its partners have handled more than fifty class action cases including class actions in Hawai'i and California state courts and federal District, Circuit, and the United States Supreme Court.

3.      I am a graduate of Bates College and the University of Hawai'i Law School where I won the Susan McKay Memorial Moot Court Award, was a member of the Moot Court team and was an academic selection for the University of Hawai'i Law Review.



4.     I am co-founder and editor-in-chief *emeritus* of the American Bar Association *Survey of State Class Action Law*, which is in its eighth edition. The Survey is published annually as a stand-alone supplement to the multi-volume class action treatise, *Newberg on Class Actions* (4th ed.) and is distributed as a sourcebook at the annual ABA National Class Action Institutes. It is also reprinted in *Consumer Class Actions* (5th edition ).

5.     I am a contributing author to both *Newberg on Class Actions* (4th ed.) and *Consumer Class Actions* (5th edition) and am co-author of *Litigating the Class Action Lawsuit in Hawai'i* (2000). I am also the author of: "Innovative Class Action Techniques – The Use of Rule 23(b)(2) in Consumer Class Actions", 14 Loyola Consumer Law Review 251 (April 2002); "Coordinated State Court Class Actions – The New Paradigm", Consumer Advocate (June 2000); "Class Actions in State Courts – A Tool for the Trial Advocate", 23 American Journal of Trial Advocacy 491 (Spring 2000) and "Class Actions and Other Multiparty Litigation in a Nutshell" (Book Review), Association of Trial Lawyers of America, TRIAL (August 2000). I am the co-author of "Class Actions Benefit Consumers", Association of Trial Lawyers of America, TRIAL (April 1997).

6.     I was co-chair of the ABA Section of Litigation Subcommittee on Class Action State Laws from 1999 to 2005. I have been a featured speaker on class action litigation at the National Consumer Law Center/National Association of Consumer Advocates Annual National Class Action Symposium in 2000, 2001, 2002, 2003 and 2005 and the National Business Institute Seminar Hawaii Class Actions in 2000.

7.     I have served as lead counsel or co-lead counsel in the following class actions in Hawaii and on the mainland:  *Atchison v. Oahu Construction*, First Circuit Court, Hawaii, (personal injury and construction defect class action on behalf of homeowners for dust

2

**EXHIBIT A**

inundation due to construction grading); *Bougainville v. State Farm,* Civil No. CV03-00312 HG BMK (insurance class action on behalf of real property policy holders for overinsurance of property; *Crandon Capital Partners v. Castle & Cooke, Inc.,* Civil No. 00-1-0146(2) (consolidated with *Soden, et al. v. Castle & Cooke, Inc., et al.,* Civil No. 00-1-0145(1) - securities class action on behalf of shareholders of Castle & Cooke, Inc. for forced sale of stock); *Does v. The Gap, Inc., et al.,* Civil No. 99-00717 DAE-LEK (human rights class action on behalf of foreign garment workers in Saipan); *Helbig v. Interstate Pharmacy Corporation,* Civil No. 02-1-2696-11 (EEH) (consumer class action on behalf of long term care residents who were sold recycled and reused medication); *Hindman v. Microsoft Corporation,* Civil No. 00-1-0945-03 (consumer class action on behalf of software purchasers against Microsoft for anti-trust and unfair competitive activities); *Kalima v. State of Hawaii,* Civil No. 99-4771-12 VSM (breach of trust class action on behalf of Hawaiian beneficiaries of the Hawaiian Homelands Trust); *Kaonohi, et al. v. Allstate Insurance Company,* Civil No. 01-1-002736 (SSM) (insurance class action on behalf of auto policy holders for improper use of credit bureau rating to set insurance rates); *Luke, et al. v. Gentry Realty, Ltd.,* Civil No. 01-1-0848-03 SSM (consolidated with *Luke, et al. v. Gentry Homes, Ltd., et al.;* Civil No. 01-1-1401-05 SSM - construction defect class action for siding design which allows ground termites to enter houses undetected); *Mariano v. State Farm Mutual Automobile Insurance Company,* Civil No. 01-1-002713 DDD (insurance class action on behalf of auto policy holders for improper use of credit bureau rating to set insurance rates); *Miller v. Liberty Mutual,* Civil No. 03-1-001199 RWP (insurance class action on behalf of real property policy holders for overinsurance of property); *Schroeder, et al. v. Schuler Homes, Inc.,* Fifth Circuit Court, Hawaii (construction defect class action for siding and slab defects); *Timmis v. Kaiser,* California Superior Court (2002) (consumer class action to stop

3

EXHIBIT A

HMO policy of splitting patient pills); *Uchimura v. GVC*, Civil No. 02-00826 DAE BMK

(consumer class action for violation of the Credit Repair Organization Act); *Uyeda, et al. v.*

*Fletcher Pacific Construction Co., Ltd. Et al.*, Civil No. 00-1-2762-09 EEH (construction defect

class action for loss of value of homes); and *Wilson, et al. v. AIG Hawaii Insurance Company, et*

*al.*, Civil No. 01-1-002740 VLC (insurance class action on behalf of policy holders for using

credit bureau rating and age to set insurance rates).

      8.    Based upon Menu Foods' recall of 60 million containers of food and Hawaii's

population, Class Counsel estimates that several hundred thousand containers of contaminated

food were sold to several thousand Hawaii consumers during the class period.

      I declare under penalty of perjury that the foregoing is correct.


DATED:      Honolulu, Hawaii, May 11, 2007.


                                _____

                                THOMAS R. GRANDE


4

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| YVONNE ORTIZ, individually and on behalf of all others similarly situated persons,<br><br>Plaintiff,<br><br>v.<br><br>MENU FOODS, INC., a New Jersey Corporation; MENU FOODS HOLDINGS, INC., a Delaware Corporation, MENU FOODS INCOME FUND, an unincorporated Canadian business; Doe Entities and Individuals 1- 100,<br><br>Defendants. | Civil No. _____<br>(Class Action)<br><br><br>NOTICE OF HEARING MOTION AND CERTIFICATE OF SERVICE |

## <u>NOTICE OF HEARING MOTION</u>

NOTICE IS HEREBY GIVEN that Plaintiffs' Motion for Class Certification shall come before the Honorable _Eden Hifo_, Judge of the above-entitled court, in his/her courtroom, Ka'ahumanu Hale, 777 Punchbowl Street, Honolulu, Hawai'i on _July 18, 2007_ at _2:00_ a.m./p.m. or as soon thereafter as counsel may be heard.

DATED:  Honolulu, Hawai'i, MAY 11 2007 _____.

_____
THOMAS R. GRANDE
EMILY A. GARDNER
Attorneys for Plaintiffs

# EXHIBIT A

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served upon the following party(ies) on May 11, 2007 by first-class mail, postage pre-paid.

Corporation Trust Center
1209 Orange Street
Wilmington, Delaware  19801

      Registered Agent for Defendants
      MENU FOODS, INC.
      MENU FOODS HOLDINGS, INC.
      MENU FOODS INCOME FUND

DATED:  Honolulu, Hawai'i, __MAY 1 1 2007__ .


_____
THOMAS R. GRANDE
EMILY A. GARDNER
Attorneys for Plaintiffs

2

# EXHIBIT A